IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| ANNETTE GILNER,<br><br>                    Plaintiff,<br><br>vs.<br><br>MID-AMERICA COUNCIL OF BOYS<br>SCOUTS OF AMERICA, and BOY SCOUTS<br>OF AMERICA,<br><br>                    Defendants. | **8:23CV299**<br><br><br>**MEMORANDUM AND ORDER** |

This matter is before the Court on the motion for summary judgment filed by Mid-America Council of Boy Scouts of America, ("MAC"), and Boy Scouts of America, ("BSA"), pursuant to Fed. R. Civ. P. 56. Filing No. 48. Plaintiff alleges that Defendants violated the Family and Medical Leave Act ("FMLA") (29 U.S.C. § 2601 et seq.), Title VII of the Civil Rights Act of 1964 ("Title VII") (42 U.S.C. § 2000 et seq.), the Nebraska Fair Employment Practices Act ("NFEPA") (Neb. Rev. Stat. § 48-1104 et seq.), the Nebraska Age Discrimination in Employment Act, (Neb. Rev. Stat § 48-1001 et seq.), and the Age Discrimination in Employment Act ("ADEA") (29 U.S.C. § 621 et seq.) and seeks damages under both state and federal statutes. *See* Complaint, Filing No. 1-1 at 10–13, ¶¶ 55, 68, 79, and 90.

**BACKGROUND**

Chris Mehaffey hired Annette Gilner (hereinafter "Gilner") to work as Chief Development Officer for MAC. Prior to her hiring, Gilner had worked for the University of Nebraska Foundation, Reliant, and Houseworks. She had a long history of working as a fundraising and development director and had done so since 2001. Gilner was employed

1

by MAC as the Chief Development Officer from February 2019 until her termination on

June 16, 2021.

As stated in part by Gilner in her Statement of Facts:

8. Boy Scouts of America assists local councils with employment-related matters, including helping them to interpret their practices or policies.

9. Boy Scouts of America helps local councils with questions about leaves of absence, paid time off policies, how to post and classify positions, how FMLA, the ADA, of leaves of absence work, and how to address performance and behavior issues.

10. Boy Scouts of America has two HR business partners that service local councils such as the Mid-America Council.

11. Boy Scouts of America provides its local councils with templates for their employment and HR policies, consisting of model policies, which it recommends they use.

12. Boy Scouts of America drafted the model anti-discrimination policy it provides for its local councils, which includes its anti-retaliation policy.

13. Local councils can make modifications to the standard policies that Boy Scouts of America provides them.

14. In practice, councils do not modify the standard policies they receive from BSA and just stick with the policies they are provided.

15. Local councils operate under charters from Boy Scouts of America.

16. A local council's charter must be renewed on an annual basis with the Boy Scouts of America.

17. The annual renewal process involves, in part, completion of a form and payment of an annual fee to BSA.

18. It is possible for a local council to lose its charter from BSA.

19. Boy Scouts of America maintains files on all its employees, including Chris Mehaffey.

20. Boy Scouts of America reviews written warnings and final written warnings for employees of local councils prior to those being presented to those employees.

2

21. Boy Scouts of America has council service territory directors who oversee geographical areas and investigate complaints about scout executives. Those positions used to be called Area Directors.

22. Council service territory directors assist local council leadership with membership growth plans, funding, budgeting, making sure camps operate in compliance with BSA's operational principles.

23. Boy Scouts of America assigns council service territory directors and employees from HR to investigate complaints made about misconduct by executive directors of local councils.

24. Boy Scouts of America has the power to force a local council to remove a scout executive.

          . . . .

26. In 2018, Lisa Russell, then an employee of Mid-America Council, accused Chris Mehaffey of gender discrimination and creating a hostile work environment.

27. Boy Scouts of America investigated Lisa Russell's complaint against Chris Mehaffey.

28. Annette Gilner's complaints were handled by Elizabeth Ramirez-Washka, the employment attorney for Boy Scouts of America.

Filing No. 61 at 2–3 (internal citations omitted).

Gilner also alleges, and it does not seem to be disputed, that in recent years, BSA no longer discriminates against gay, lesbian, and trans individuals, nor does it now discriminate against women. Filing No. 61 at 3–4, ¶¶ 32–36. In addition, the Scouts do not require an employee or member to be of a particular religion.

According to the MAC Employee Handbook, the organization prohibits discrimination, retaliation, and harassment:

. . . on the basis of any protected category, including, but not necessarily limited to, race, color, national origin, religion, age, disability, sex (including pregnancy, childbirth, breastfeeding, or related medical condition, gender identity, sexual orientation, marital or familial status, veteran status, genetic information, citizenship status, protected activity (such as opposition to or reporting of prohibited discrimination or harassment), or any other status or classification protected by federal, state, and/or local laws. In keeping with

3

that policy, the Council will not tolerate harassment of any kind by or of any employees or applicants for employment.

Filing No. 50-4 at 8.    Further, the Equal Employment policy states:

The Council is committed to equal employment opportunity prohibiting workplace discrimination and retaliation on the basis of race, color, national origin, religion, age, sex (including pregnancy, childbirth, breastfeeding, or related medical condition), sexual orientation, gender identity, marital or familial status, veteran status, genetic information, citizenship status, protected activity (such as opposition to or reporting of prohibited discrimination or harassment), or any other status or classification protected by federal, state, and/or local laws. This policy of equal employment opportunity applies to all aspects of the employment relationship, including without limitation advertising, recruiting, hiring, training, evaluation, promotion, transfer, work assignments, compensation, benefits, disciplinary action, termination, or any other term, condition, or privilege of employment.

Filing No. 50-4 at 8.

Lisa Russell worked for MAC from 2001 through 2017, most recently as communications specialist.  Gilner submits Russell's deposition evidence in support of her assertion that Mehaffey treated the women he supervised in a manner very similar to the treatment of Gilner.  *See* Filing No. 61 at 6–8, ¶¶ 59–77.

Gilner contends that she received a performance evaluation in 2019, but Mahaffey refused to give her a copy of it.  Mehaffey has survived four hostile work complaints against him.  Ryan Pickett, a previous Eagle Scout, was hired by Mehaffey.  Pickett started in January 2019, as Assistant Director of Field Service, and, during the hiring process, he negotiated the possibility of transitioning into a development role down the road.  Pickett became a Development Director in 2020.  Gilner contends that Mahaffey treated her as Pickett's assistant.  Gilner was charged with training Pickett.  Credit for Gilner's work was often diluted and classified as being part of a "team effort."  *See generally* Filing No. 60-18.  Additionally, Mehaffey had also taken credit for Gilner's work.  For example, Gilner

asserts that she was working on a $325,000 request from United Way.  Mehaffey, without discussing with her, went to United Way, pulled the $325,000 request, and asked and received a $50,000 grant instead.  Filing No. 61 at 10, ¶¶ 95–97.  Further, on her evaluation, Gilner received average marks, while Pickett received very high marks.  Filing No. 60-18, Gilner's 2020 Evaluation; Filing No. 60-26, Pickett's 2020 Evaluation

Gilner spoke to Mehaffey and told him she felt like he created a discriminatory environment.  Mehaffey then contacted his boss and told him about her comments and said she was rude, and he would not take rudeness from her.  *See* Filing No. 61 at 12, ¶¶ 115–17.

In addition, Gilner suffers from depression, anxiety, and PTSD.  She subsequently, on February 16, 2021, she took FMLA.  Filing No. 60-13, *see also* Filing No. 60-7.  While at home during her FMLA, Gilner was told by Mehaffey that she must return her work laptop.  Once her laptop had been returned, Mehaffey requested, and was granted, access to Gilner's emails for the 45 days prior to her leave.  It was then discovered that she had forwarded documents to her personal email.  Gilner had forwarded documents to her herself many times in the past while working from home without incident.  Mehaffey then wrote to Gilner indicating that prior to her leave, there had been issues with her performance and instructed her to delete the documents she had sent to her personal email.  Filing No. 50-14.  She gave her documents to her attorneys and then deleted them.  On June 9, 2021, Gilner sent a formal complaint regarding her allegations of discrimination and harassment based on sex, age, disability, interference with her FMLA rights, and retaliation related to her previous protected activity to Mehaffey, Michelle Hurt,

5

Spencer Finley, Roger Mosby, and Elizabeth Washka.  Filing No. 60-4 at 66, Gilner Dep. 254:11–255:4.  Mehaffey acknowledges that he received Gilner's letter.

Seven days later, on June 16, 2021, Mehaffey sent Gilner a termination letter, citing the reason for her termination was that she had been sending emails to herself.  Filing No. 60-6.  Despite stating that he had lost trust in Gilner because he believed she used donor information to get a job with the Women's Fund, Mehaffey admits he had no reason to believe Gilner actually submitted any donor information to the Women's Fund.  Filing No. 60-12 at 12, Mehaffey Dep. 45:9–12.  Furthermore, Mehaffey never received any information to indicate that Gilner provided any donor information to anyone outside of MAC.  Filing No. 60-12 at 50, Mehaffey Dep. 198:11–17.  After Mehaffey fired Gilner, Pickett took over her job duties and was ultimately promoted to Chief Development Officer.

### STANDARD OF REVIEW

"Summary judgment is proper 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'"  *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting Fed. R. Civ. P. 56(c)(2)).  The court views facts in the light most favorable to the nonmoving party, and makes no determinations of credibility.  *Cottrell v. Am. Fam. Mut. Ins. Co., S.I.*, 930 F.3d 969, 971–72 (8th Cir. 2019).  Further, the Court does not weigh the evidence or draw inferences, as those functions belong to the jury.  *Id.*  "Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate."  *Koehn v. Indian Hills Cmty. Coll.*, 371 F.3d 394, 396 (8th Cir. 2004).

6

**DISCUSSION**

The Court first notes that the parties have both agreed to the dismissal of Counts III and IV, claims based on age discrimination both under the Nebraska Age Discrimination in Employment Act and the Federal Age Discrimination in Employment Act, with prejudice, and defendants have agreed they will not assert a defense to either the FMLA interference or retaliation claims under Count VII of the Complaint that it did not employ more than fifty (50) employees during the relevant calendar year.  Filing No. 74, Joint Stipulation; *see also* Filing No. 75, Order of Dismissal of Claims.

Next, the Court will address whether the summary judgment motion should be denied or granted.  The Court must not weigh the evidence and make a determination. As pointed out above in the Background section of this Memorandum and Order, the parties clearly have conflicting evidence and analysis sufficient to require that this case proceed to a jury determination.

### A.  Whether BSA should be Dismissed as a Party Because it was Not Gilner's Employer.

Defendants contend that they are totally separate entities.  MAC is a separate corporate entity from BSA and maintains its own Employer Identification Number.  MAC makes all decisions for MAC employees, including checking references, doing interviews, and making the hiring decision, and the BSA national office is responsible for conducting a criminal background check on an applicant.  BSA does provide some support to local councils, including MAC, such as providing technological services (e.g., Office 365, e-mail system, etc.), help with human resources such as reviewing Performance Improvement Plans or PIPs, and legal support.  MAC's Board of Directors is composed

of local volunteers who are not members of the BSA's Board of Directors.  None of MAC's employees are in leadership roles or employed with BSA.

Defendants argue that BSA was not Gilner's employer, and on that ground alone, all such claims against BSA should be dismissed.  Defendants argue that a plaintiff may only bring a claim against her employer under Title VII, NFEPA, and the FMLA. *Schwieger v. Farm Bureau Ins. Co. of NE*, 207 F.3d 480 (8th Cir. 2000).  The failure to prove the existence of an employer-employee relationship is fatal to Gilner's claims against BSA, argue the Defendants *Glascock v. Linn Cnty. Emergency Med., PC*, 698 F.3d 695, 698 (8th Cir. 2012).

Gilner disagrees, arguing that the relationship between the defendants is one denoted as a joint enterprise.  "An integrated enterprise is 'one in which the operations of two or more employers are considered so intertwined that they can be considered the single employer of the charging party.'" *Davis v. Ricketts*, 765 F.3d 823, 827 (8th Cir. 2014) (quoting EEOC Compliance Manual § 2–III(B)(1)(a)(iii)).

In making that determination, courts consider: "(1) the degree of interrelation between the operations, (2) the degree to which the entities share common management, (3) the centralized control of labor relations, and (4) the degree of common ownership or financial control over the entities." *Davis*, 765 F.3d at 827; *Bowen v. Methodist Fremont Health*, 2020 U.S. Dist. LEXIS 67307 (D. Neb. Apr. 16, 2020).

The Court finds there are significant factual issues in this regard.  There are overlapping management issues.  Both defendants appear to have separate boards of directors.  However, BSA does offer some human resources support and training.  On the one hand, MAC does most of its hiring and firing and sets many policies and salaries.

However, it is also clear that policy manuals and policy examples are provided by BSA to help with these issues. BSA provides its local councils with an employee template handbook, which contains employment policies designed by BSA for council use. Filing No. 60-8 at 4, Davis Dep. 14:10–19. The model policies provided by BSA to the local councils include an anti-harassment policy, a policy on accommodating individuals with disabilities, and a policy on FMLA Leave. Filing No. 60-8 at 4, Davis Dep. 14:20–15:13. Local councils "pretty much" stick to the employment policies they are provided by BSA. Filing No. 60-8 at 5, Davis Dep. 17:21–18:1. BSA hands out charters to the local chapters, and they are required to obtain a charter to be a Scout entity, and these must be renewed annually.

BSA has acknowledged that Mehaffey is an employee of BSA, who is supervised by BSA, has a personnel file maintained by BSA, engaged in alleged misconduct which was investigated by BSA, and could ultimately be terminated by BSA. Filing No. 60-8 at 6, 8, and 12, Davis Dep. 24:17–20, 29:17–24, 45:7.

BSA provides training to local council officials. BSA assists local councils with employment-related matters, which includes helping them to interpret their practices or policies. Filing No. 60-8 at 2, Davis Dep. 8:5–12. BSA helps local councils with questions about leaves of absence, paid time off policies, how to post and classify positions, how FMLA, the ADA, and leaves of absence work, and how to address performance and behavior issues. If local councils such as MAC choose to have a Scout Executive, they must choose from a handful of career employees of BSA, who have been pre-selected and vetted by BSA. Filing No. 63 at 8. BSA maintains files on all of its employees,

9

including Mehaffey. Mehaffey, as Scout Executive, has his annual review conducted by the Council Service Territory Director for BSA.

BSA reviews written warnings and final written warnings for employees of local councils prior to those being presented to those employees. Filing No. 60-8 at 14, Davis Dep. 54:13–55:15. BSA employs Council Service Territory Directors who oversee geographical areas and investigate complaints about Scout Executives. Filing No. 60-8 at 12, Davis Dep. 45:7–46:1. Council Service Territory Directors assist local council leadership with membership growth plans, funding, budgeting, and ensuring camps operate in compliance with BSA's operational principles. Filing No. 60-8 at 12, Davis Dep. 48:8–21. BSA assigns Council Service Territory Directors and employees from HR to investigate complaints made about misconduct by Executive Directors of local councils and has the power to force a local council to remove a Scout Executive. Filing No. 60-8 at 12–13, Davis Dep. 48:22–50:16, 52:15–20. BSA's Council Service Territory Directors investigated Lisa Russell's and Annette Gilner's allegations against Mehaffey. Filing No. 60-10 at 31, Mehaffey 30(b)(6) Dep. 121:15–20.

Lastly, according to Gilner, youth and adult members of Boy Scouts of America pay membership fees, which are divided between the local council and the national organization. Local councils sell Boy Scout guides, regalia, badges, and equipment. The proceeds of those sales are divided between the local council and the national organization. *Scout Life* magazine (formerly *Boys' Life*) is published by BSA. Revenue from subscriptions to *Scout Life* is shared between the national organization and the local councils. BSA and the local councils also participate in joint fundraising efforts.

**B. Are Defendants Exempt from Coverage under Title VII and NFEPA as Bona Fide Private Membership Clubs and Entitled to Judgment as a Matter of Law.**

Defendants argue that BSA and MAC are not covered "employers" under Title VII and the NFEPA because each is a "bona fide private membership club." 42 U.S.C. § 2000e(b)(2); Neb. Rev. Stat. § 48-1102(2)(b). Therefore, Defendants assert that Gilner's claims of sex discrimination and retaliation fail as a matter of law. Filing No. 51 at 6. Title VII exempts from coverage "a bona fide private membership club (other than a labor organization) which is exempt from taxation under Section 501(c) of Title 26." 42 U.S.C. § 2000e(b)(2).

Similarly, ADA requirements do not apply to an employer that is "a bona fide private membership club (other than a labor organization) that is exempt from taxation under section 501(c) of Title 26." 42 U.S.C. § 12111(5)(b)(ii). Both of the defendants are tax exempt. Defendants further argue that BSA and MAC are selective in membership in that all applicants and members must be willing to subscribe to the Scout Oath, Scout Law, and Declaration of Religious Principle. Filing No. 51 at 10.

Gilner argues that the previous law, the *Dale* case, is no longer good law. Today, Scouting America accepts anyone who wishes to join, regardless of their gender, sexual identity, or sexual preference, including LGBTQI A+ persons, as well as women, to become scouts and employees. Filing No. 63 at 16. These changes in policy indicate significant changes in membership, casting disarray on the arguments the defendants make that the private club argument set forth in *Dale* still applies. *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 654–655 (2000). The Court need not decide whether *Dale* is any longer good law, as it is not relevant to the decision on this issue, as set forth below.

The *Dale* case dealt with a scoutmaster who was expelled after he publicly expressed that he was a "homosexual."  Justice Rehnquist opined that the New Jersey accommodations law, which would require the Boy Scouts to readmit *Dale*, violated the Boy Scouts' First Amendment right of expressive association.  The case was based on the assertion that "homosexual" conduct was inconsistent with the values expressed through the Scout Oath.  Justice Rehnquist stated that "such forced membership is unconstitutional if the person's presence affects in a significant way the group's ability to advocate public or private viewpoints." *Dale*, 530 U.S. at 648.

The case before this Court is distinguishable from *Dale*.  First, the Scout Oath is not an issue in this case.  Likewise, the issue of expressive speech is not an issue in this case.  The issue before the Court involves the plaintiff who alleges discrimination in employment on the basis of sex and retaliation.  Her allegations have nothing to do with the religious fiber of the Boy Scouts or the Scout Oath.  Further, the Boy Scouts have an Equal Employment policy, *see supra* pp. 3–4, a Non-Harassment Policy, *see supra* p. 4, an Accommodating Employees with Disability Policy, and a Religious Accommodation policy. Filing No. 50-4 at 8–11.  The Equal Employment and the Non-Harassment policies apply to Gilner's discrimination and retaliation allegations in this case.  For these reasons, the Court concludes that the private membership club exemption does not apply to this case.

### C.  The Merits

Last, the defendants argue that even if the Court held that the private membership club exemption did not apply, Gilner's claims would fail on the merits.  Assuming Gilner could state prima facie claims under the various statutes at issue, MAC argues that it

12

terminated her employment for legitimate, non-discriminatory reasons.  Defendants argue that Gilner is unable to show and sex-based discrimination in this regard.  Defendants contend that Gilner was discharged for non-discriminatory reasons, namely that she emailed work documents to her home during her FMLA time.  *Lindeman v. Saint Luke's Hosp. of Kansas City*, 899 F.3d 603, 606 (8th Cir. 2018) (disclosure of confidential information is a legitimate, nondiscriminatory reason for termination).

Plaintiff contends that the reasons expressed by the defendants are factually disputed.  Gilner argues that she always had access to these documents from both work and home.  They were, she argues, necessary to do her job as a fundraiser.  When she suspected that she was being forced to quit or to be fired, she sent the documents to her attorneys.  She was then fired.  These allegations are sufficient to show that she and the defendants have very different stories as to what happened.  These are factual disputes and must be decided at trial.  Accordingly, the Court will deny the motion on the merits at this time.

### D.  Retaliation

Defendants argue that Gilner cannot establish a prima facie case of retaliation under Title VII or NFEPA.  Gilner also asserts she was retaliated against for complaining about discrimination or harassment based on her sex.  She raises retaliation claims under Title VII and the NFEPA, in Counts V and VI of her Complaint.  In accordance with the *McDonnell Douglas* framework, to establish unlawful retaliation, a plaintiff must establish a prima facie case that would permit a reasonable jury to find that (1) she engaged in a statutorily protected activity; (2) the employer took an adverse action against her; and (3) there was a causal connection between the adverse action and the protected activity.

13

Filing No. 51 at 14, citing *Hill v. Walker*, 737 F.3d 1209, 1218 (8th Cir. 2013); *Stewart v. Indep. Sch. Dist. No. 196*, 481 F.3d 1034, 1042–43 (8th Cir. 2007).

If a plaintiff establishes a prima facie case, the burden shifts to the employer to show a legitimate, nondiscriminatory reason for its actions. *Id.* "If such a reason is proffered, the burden then returns to [plaintiff] to 'present evidence that (1) creates a question of fact as to whether [the employer]'s reason was pretextual and (2) creates a reasonable inference that [the employer] acted in retaliation.'" *Gibson v. Concrete Equip. Co., Inc.*, 960 F.3d 1057, 1064 (8th Cir. 2020) (quoting *Stewart*, 481 F.3d at 1043). Defendants contend that Gilner did not participate in any protected activity. Defendants contend that any of these assertions by Gilner are just microaggressions.

However, Gilner has offered substantial evidence to support her claims on the merits. As argued by Gilner, "an employee with a good faith reason to believe his employer is engaged in unlawful [] discrimination 'has a legitimate interest in preserving evidence of [his employer's] unlawful employment practices.'" *Kempcke v. Monsanto Co.*, 132 F.3d 442, 445 (8th Cir. 1998). In *Kempcke*, the Eighth Circuit reversed the district court's summary dismissal of an age discrimination plaintiff's claim, finding the plaintiff's refusal to return documents he reasonably believed supported an age discrimination claim was protected activity. *Id.* at 445, 447.

In its opinion, the Eighth Circuit noted that the documents Kempcke refused to return were "quite innocuous," but Kempcke inferred that age was a factor in the reduction in force, and confronted his supervisor, demanding an explanation, thereby engaging in protected activity. *Id.* at 445. Furthermore, by giving the documents to his attorney, Kempcke engaged in what was "arguably oppositional or litigation activity, because it

14

placed documents that might evidence discrimination in the hands of a legal professional who would litigate the issue on Kempcke's behalf if he could not resolve the matter informally with Monsanto." *Id.* The Eighth Circuit has ruled that "employees in these situations have a duty to safeguard the employer's documents and confidential information. But when documents have been innocently acquired, and not subsequently misused, there has not been the kind of employee misconduct that would justify withdrawing otherwise appropriate § 623(d) protection." *Kempcke*, 132 F.3d at 446. Furthermore, for purposes of this motion, the Court determines that Gilner has likewise established sufficient evidence to continue to trial.

### E. FMLA claim

Defendants argue that Gilner cannot show evidence of a retaliation claim under the FMLA. Gilner was given 16 weeks of FMLA. "Termination is actionable under FMLA only if the employee was discharged because of her FMLA leave." *Hasenwinkel v. Mosaic*, 809 F.3d 427, 433 (8th Cir. 2015). In other words, "an employer who interferes with an employee's FMLA rights will not be liable if the employer can prove it would have made the same decision had the employee not exercised the employee's FMLA rights." *Throneberry v. McGehee Desha Cnty. Hosp.*, 403 F.3d 972, 977 (8th Cir. 2005). Again, Defendants argue Gilner was fired for sending confidential documents to her email while on FMLA.

While MAC granted Gilner's FMLA leave requests, the organization failed to return her to the same or similar position at the end of her leave. *See Lovland v. Emps. Mut. Cas. Co.*, 674 F.3d 806, 811 (8th Cir. 2012) ("terminating an employee while on FMLA leave" can be interference). There is evidence to suggest that Mehaffey had no intention

of returning Gilner to her pre-leave position, including meeting with Pickett during Gilner's leave to discuss whether Pickett could fill her position. Filing No. 60-27 at 18, Vanosdall Dep. 69:20–70:15. For some of the same reasons already articulated herein, Title VII retaliation and discrimination claims, Defendants' argument in support of summary dismissal of Gilner's FMLA retaliation claim fails.

For the reasons set forth in this Memorandum and Order, the Court finds there is sufficient evidence on all causes of action to proceed to trial.

**THEREFORE, IT IS ORDERRD THAT** the Defendants' motion for summary judgment, Filing No. 48, is denied. This case shall proceed to trial as set forth herein.

Dated this 9th day of March, 2026.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge